UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Matt Ravenell, Travis Lubbers, and Tyler Talkington, Individually and Behalf of All Other Persons Similarly Situated, | Index No.  08-2113 (SLT-ALC) |
| Plaintiffs, | |
| -against- | **ORAL ARGUMENT REQUESTED** |
| Avis Budget Car Rental, LLC and Avis Rent A Car System, LLC, | |
| Defendants. | |

## <u>DEFENDANTS AVIS RENT A CAR SYSTEM, LLC'S AND AVIS BUDGET CAR RENTAL, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION PURSUANT TO SECTION 216(b) OF THE FLSA</u>

LITTLER MENDELSON, P.C.

Kimberly J. Gost (KG0881)
James N. Boudreau (*admitted pro hac vice*)
Nina K. Markey (*admitted pro hac vice*)
1601 Cherry Street, Suite 1400
Philadelphia, PA  19103
Telephone:  (267) 402-3000
Facsimile:  (267) 402-3131
jboudreau@littler.com
kgost@littler.com
nmarkey@littler.com

Attorneys for Defendants Avis Rent A Car System, LLC & Avis Budget Car Rental, LLC

## TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ...................................................................................................1

II.  DISCOVERY .......................................................................................................2

III.  MATERIAL FACTS .............................................................................................3

    A.  AVIS AND ABCR ....................................................................................3

    B.  AIRPORT AND OFF-AIRPORT LOCATIONS......................................3

    C.  MANAGEMENT STRUCTURE AT AVIS BRANDED LOCATIONS ..........................4

    D.  NAMED PLAINTIFFS ............................................................................5

    E.  OPT-INS ..................................................................................................6

    F.  JURY TRIAL VERSUS NON-JURY TRIAL .........................................7

    G.  SHIFT MANAGERS' JOB DUTIES .......................................................7

IV.  ARGUMENT ......................................................................................................14

    A.  PLAINTIFFS HAVE NOT ESTABLISHED ENTITLEMENT TO NOTICE UNDER SECTION 216(b) OF THE FLSA ....................................14

        1.  Evidence of Interest in this Litigation is Minimal ...............................15

        2.  Plaintiffs Have Not Established That They Are "Similarly Situated" to a Nationwide Group of Shift Managers ...................................16

            i.  The Lenient Standard Does Not Apply.................................16

            ii.  Plaintiffs Have Not Shown That Avis Subjected Them or Anyone Else To A Uniform Illegal Policy...............................17

        3.  Common Proof Cannot Resolve the Alleged Exemption At Issue, Thus Requiring Individualized Hearings ....................................20

        4.  Plaintiffs' Proposed Collective Action Is Wholly Unmanageable And Inappropriate For Collective Adjudication ........................21

            i.  Plaintiffs' Proposed Collective Action Is Rife With Due Process Issues.................................................................22

        5.  Plaintiffs' Collective Action Definition is Unascertainable................23

    B.  PLAINTIFFS' PROPOSED NOTICE IS DEFECTIVE AND INADEQUATE .............24

V.  CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Ale v. Tennessee Valley Auth.*, 269 F.3d 680 (6th Cir. 2001)......................................................18

*Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459 (S.D.N.Y. 2008)...........15, 16, 17

*Barten v. KTK & Assoc. Inc.*, C.A. No. 06-1574, 2007 WL 2176203 (M.D. Fla. July 26, 2007)..............................................................................................................................................15

*Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179 (E.D. Pa. 2007)......................................24

*Bohn v. Park City Group, Inc.*, 94 F.3d 1457 (10th Cir. 1996)..................................................18

*Bosley v. Chubb Corp.*, C.A. No. 04-4598, 2005 WL 1334565 (E.D. Pa. June 3, 2005)..........17

*Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870 (N.D. Iowa 2008)...............................16

*Bowens v. Atlantic Maintenance Corp.*, 546 F. Supp. 2d 55 (E.D.N.Y. 2008)..........................24

*Bunyan v. Spectrum Brands, Inc.*, C.A. No. 07-0089-MJR, 2008 WL 2959932 (S.D. Ill. July 31, 2008)..............................................................................................................................16

*Castro v. Spice Plate, Inc.*, C.A. No. 07-4657, 2009 WL 229952 (S.D.N.Y. Jan. 3, 2009).....17

*Chowdhury v. DuaneReade, Inc.*, No. 06-2295, 2007 WL 2873929 (S.D.N.Y. Oct. 2, 2007)..............................................................................................................................................25

*Clausman v. Nortel Networks, Inc.*, C.A. No. 02-0400, 2003 WL 21314065 (S.D. Ind. May 1, 2003).............................................................................................................................21

*Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272 (M.D. Ala. 2004).................16

*Diaz v. Electronics Boutique of America*, C.A. No. 04-0840E(SR), 2005 WL 2654270 (W.D.N.Y. Oct. 17, 2005)........................................................................................................22

*Dudley v. Texas Waste Systems, Inc.*, Civ. Act. No. 05-ca-0078, 2005 WL 1140605 (W.D. Tex. May 16, 2005).........................................................................................................22

*Dunn v. Fairfield Resorts, Inc.*, No. 06-cv-3355 (Dec. 12, 2006 Order)....................................7

*Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)................15

*Flores v. Osaka Health Spa, Inc.*, No. 05 Civ. 962, 2006 WL 695675 (S.D.N.Y. Mar. 16, 2006)..............................................................................................................................................17

*Guzman v. VLM, Inc.*, C.A. No. 07-1126, 2007 WL 2994278 (E.D.N.Y. Oct. 11, 2007).........24

*Harris v. District of Columbia*, 741 F. Supp. 254 (D.D.C. 1990)............................................20

*Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862 (S.D. Ohio 2005)..................................22

*Hinojos v. The Home Depot, Inc.*,  C.A. No. 06-00108, 2006 WL 3712944 (D. Nev. Dec. 10, 2006)...................................................................................................................................22

*Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265 (M.D. Ala. 2004)........................................19, 21

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)..........................................17

*Jennifer Myers v. The Hertz Corp.*, 02-cv-4325, 2007 U.S. Dist. LEXIS 53572 (E.D.N.Y. July 24, 2007).........................................................................................................................1, 2

# TABLE OF AUTHORITIES
### (CONTINUED)

*Jennifer Myers v. The Hertz Corp.*, No. 02-cv-4325, 2006 U.S. Dist. LEXIS 47999 (E.D.N.Y. July 17, 2006).................................................................................................2

*Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567 (E.D. La. 2008)........................22

*King v. West Corp.*, C.A. No. 04-318, 2006 WL 118577 (D. Neb. Jan. 13, 2006)...................19

*Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003)......................19, 20, 23

*Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493 (D.N.J. 2000)...............16, 18, 19, 20

*Myers v. Hertz Corp.*, C.A. No. 02-4325, 2007 WL 2126264 (E.D.N.Y. July 24, 2007)...........21

*Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159 (D. Minn. 2007) .....................15

*Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 WL 198888 (N.D. Ill. Feb. 8, 2000)..............................................................................................23

*Prizmic v. Armour, Inc.*, C.A. No. 05-2503, 2006 WL 1662614 (E.D.N.Y. June 12, 2006) .........17

*Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D. Minn. Feb. 15, 1996) ....................................................................................22

*Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623 (D. Colo. 2002) .........................................24

*Saleen et al. v. Waste Mgmt., Inc.*, C.A. No. 08-4959, 2009 WL 1664451 (D. Minn. June 15, 2009).................................................................................................21

*Scott v. Aetna Servs.*, 210 F.R.D. 261 (D. Conn. 2002) ..........................................19

*Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264 (D. Minn. 1991) ..........................15, 17

*Sheffield v. Orius Corp.*, 211 F.R.D. 411 (D. Or. 2002) ............................................3, 23

*The Hertz Corp.*, 2006 U.S. Dist. LEXIS 47999 ....................................................20

*The Hertz Corp.*, 2007 U.S. Dist. LEXIS 53572......................................................19

*Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411 (D. Del. 2007)...........16

*Walker v. The Mountain States Tel. and Tel. Co.*, 112 F.R.D. 44 (D. Colo. 1986), vacated on other grounds, No. 84-M-790, 1988 WL 1000060 ..............................................24

*West v. Border Foods, Inc.*, C.A. No. 05-2525, 2006 WL 1892527 (D. Minn. July 10, 2006)..................................................................................................15

*Wilson v. Toussie*, No. 01-4568, 2008 WL 905903 (E.D.N.Y. March 31, 2008) ...............23, 24

## STATUTES

29 U.S.C. § 216(b) ......................................................................................1, 2, 15, 16, 19, 20

29 C.F.R. § 541.2 ..........................................................................................20

## I.      INTRODUCTION

Nearly one and one-half years after the initial filing of this action,[1] Plaintiffs now move this Court to send notice to a proposed group of individuals (with whom Plaintiffs argue they are similarly situated) pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA") and to certify this action as a collective action.[2] Despite the age of this case, Plaintiffs have demonstrated little interest in this case to warrant the sending of any type of notice. Moreover, the parties engaged in protracted and extensive discovery related to conditional certification, making the issue ripe for resolution by the Court at this time. As a result, notwithstanding Plaintiffs' arguments to the contrary, Plaintiffs are not entitled to a "lenient" standard of review as to whether this case is appropriate for collective action status. Rather, this Court should perform an exacting analysis of Plaintiffs' request for certification and Defendants' opposition to that request in light of all of the evidence that has already been discovered in this case. That evidence plainly reveals that Plaintiffs are not similarly-situated to other shift managers.[3] Notably, the United States District Court for the Eastern District of New York denied a request to send judicial notice pursuant to Section 216(b) of the FLSA to a group of station managers[4] employed by The Hertz Corporation, another rental car company. *See Jennifer Myers v. The Hertz Corp.*, 02-cv-4325, 2007 U.S.

---

[1] Plaintiff Matt Ravenell, a former Shift Manager employed by Defendant Avis Rent A Car System, LLC ("Avis") at La Guardia Airport in New York ("La Guardia") for four months, filed this action on May 23, 2008 claiming that he and others who are purportedly similarly situated to him were misclassified by Defendants as exempt under the FLSA. In February 2009, seven current and former shift managers who were employed by either Defendant Avis or Defendant Avis Budget Car Rental, LLC ("ABCR") at either Dulles International Airport ("Dulles") in Virginia or Reagan National Airport in Virginia ("Reagan") (collectively "Opt-Ins") filed Consents to become parties to this action pursuant to 29 U.S.C. § 216(b). In this action, Plaintiff Ravenell also asserts that he and other shift managers who work or worked in New York were denied overtime in violation of New York Labor Laws and purports to bring a Rule 23 class action with respect to that claim. Plaintiffs' instant motion addresses only their claims under the FLSA, however. On September 16, 2009, Plaintiffs filed an Amended Complaint adding Tyler Talkington and Travis Lubbers as Named Plaintiffs for the purpose of allowing them to assert individual retaliation claims against Defendants. (Dkt. entry no. 56).

[2] In their Motion, Plaintiffs assert that they seek to certify a collective action of shift managers who work at Avis branded locations. (Pl. Br. at 1, 4). Accordingly, throughout this Opposition unless otherwise specified, when Avis or ABCR rental locations are referenced, Defendants are referring to Avis branded locations, not Budget branded locations.

[3] Significantly, all of the Named Plaintiffs and one of the Opt-Ins executed a jury trial waiver and, thus, they waived their right to a jury trial. On the other hand, the remaining Opt-Ins did not waive their right to a jury trial. These two groups of individuals (i.e., those who executed jury trial waivers and those who did not) cannot be similarly situated for due process reasons alone.

[4] A station manager at Hertz is the equivalent position to a shift manager at Defendants. (Declaration of Paul Stalzer, Def. Ex. B, at ¶ 3).

Dist. LEXIS 53572, at *3 (E.D.N.Y. July 24, 2007) (Cogan, U.S.D.J.) (denying Rule 23 certification and quoting from its earlier opinion denying collective action certification under FLSA Section 216(b): "The Court finds that the Plaintiff's motion suffers from a fatal flaw that further discovery cannot cure: because liability as to each putative plaintiff depends upon whether that plaintiff was correctly classified as exempt [], any collective action would require the Court to make fact-intensive inquiry into each potential plaintiff's employment status"); *Jennifer Myers v. The Hertz Corp.*, No. 02-cv-4325, 2006 U.S. Dist. LEXIS 47999 (E.D.N.Y. July 17, 2006) (Hurley, U.S.D.J.) (denying motion for reconsideration of the court's denial of plaintiff's request for collective action certification pursuant to 216(b)).  This Court should deny Plaintiffs' Motion as well and compel the Named Plaintiffs (and, in the Court's discretion, the Opt-Ins) to move forward with their FLSA claims on an individual basis.

## II.    DISCOVERY

From September 2008 through August 2009, the parties engaged in extensive discovery with respect to the instant Motion.  Indeed, Plaintiffs served Defendants with three sets of document requests, three requests for interrogatories and took the deposition of two corporate witnesses.[5]  Defendants served all of the Named Plaintiffs and Opt-Ins with one set of document requests and took each of their depositions.  Defendants also served Plaintiff Ravenell with one set of interrogatories.  In addition, Defendants produced to the Plaintiffs the names and telephone numbers for all of the individuals from whom they obtained declarations (*see* Section III.G, infra).  Plaintiffs had ample time to contact Defendants' declarants.  Plaintiffs' brief however is void of any evidence that rebuts the testimony contained in Defendants' declarations.

Notwithstanding that the parties engaged in discovery for nearly one year and that Plaintiffs served multiple discovery requests and made multiple demands for further information, Plaintiffs conveniently chose not to use – and, in fact, to ignore – much of the information exchanged during discovery in order to bolster their argument that this Court should use a lenient standard in evaluating their instant Motion.  As will be explained in detail below, Plaintiffs' tactics should not be rewarded.

---

[5] Defendants produced approximately 3,550 pages of documents to Plaintiffs.

III.    **MATERIAL FACTS**

A.    **AVIS AND ABCR**

ABCR is an indirect wholly owned subsidiary of Avis Budget Group, Inc. ("ABG").  ABCR

employs individuals in various positions, including shift managers who work at both Avis branded and

Budget branded locations.  Avis employs shift managers who work at certain Avis branded locations.

(Deposition of Elaine Vitello ("Vitello Dep."), Pl. Ex. D, at 7).  Avis is an indirect wholly owned

subsidiary of ABCR.  ABG, Avis and ABCR are distinct legal entities.[6]  Avis branded locations operate

in four distinct Areas:  Northeast, Southeast, Central and West.  All of the locations at which the Named

Plaintiffs and Opt-Ins worked (i.e., LaGuardia, Reagan and Dulles) are part of the Northeast Area.

(Declaration of Gina Bruzzichesi ("G. Bruzzichesi Decl.") at ¶ 3, Def. Ex. A).

B.    **AIRPORT AND OFF-AIRPORT LOCATIONS**

Avis rental locations are vast and varied.  They range from large and small U.S. airport rental

operations that cater to business and leisure customers and are typically open for business 24 hours per

day to off-airport local neighborhood market stores located in cities or suburban markets, catering to

customers seeking vehicles for more local purposes including insurance replacement, repairs or longer

term temporary needs.  (G. Bruzzichesi Decl. ¶ 4).

The vehicle industry is not SIC classified as a retail service and it differs dramatically from the

typical retail storefront environment.  (G. Bruzzichesi Decl. ¶ 9).  A typical retail store company has

individual departments contained within a particular store that do not vary much from store to store.  This

is not the case with Avis rental locations.  No two Avis locations are identical.  Among the airport and

off-airport locations, operational departments/functions vary widely (such as, rental counter, service area,

and courtesy buses).  (G. Bruzzichesi Decl. ¶ 7).  For example, some locations do not have a service area

on-site and instead send the rental cars to another location for servicing.  And, at some airport locations,

the airport authority, rather than Avis, provides the transportation, such as courtesy buses or monorails,

---

[6] The fact that some putative class members are employed by ABCR while others are employed by Avis renders
them not similarly-situated for this reason alone.  *Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002)
(putative class members not similarly situated where, inter alia, they were employed by different subsidiaries).

and, therefore, Avis employs no shift manager with responsibility for managing the busing function at that airport.  At other airport locations, Avis employs a team of bus drivers and, in turn, a shift manager with responsibility for managing those bus drivers.  (G. Bruzzichesi Decl. ¶ 7).

Off-airport locations typically have a comparatively smaller fleet of cars and handle a lesser volume of rentals than airport locations.  (Lupear Decl. ¶ 8; Deposition of Muhammed Bashir ("Bashir Dep."), Pl. Ex. I, at 9).[7]  As one shift manager at an off-airport location notes, her location "is different from the Avis facilities at airports in the area."  (Lupear Decl. ¶ 7).  Even within the airport locations, the operations vary depending upon whether the airport typically services the leisure or business traveler.  (G. Bruzzichesi Decl. ¶¶ 4-5).

### C.   MANAGEMENT STRUCTURE AT AVIS BRANDED LOCATIONS

The number and types of managers employed at an Avis rental location varies greatly from location to location, and affects what particular job duties are performed by shift managers.  (Vitello Dep. at 149).  Not every Avis rental location employs a shift manager.  (Vitello Dep. at 14).  Whether there is a shift manager and how many shift managers work at a particular Avis rental location depends upon the size of the location, the physical design of the location, the volume of rentals at the location, and the number of employees at the location.  (Vitello Dep. at 14).  Generally, at an airport location, the most senior manager at the location is an airport manager, and there could be one to three airport managers working at that location.  (Vitello Dep. at 33).  Airport managers report to district managers, who are responsible for a number of locations in a particular district.  (Vitello Dep. at 34).  At some airport locations, the airport manager(s) may report to a city manager instead of a district manager.  (Vitello Dep. at 34).  At airport locations, the shift managers typically report to the airport managers.  (Winkfield-Williams Decl. ¶ 6).  At off-airport locations, there are no airport managers and, as such the reporting hierarchy for a shift manager is different.  At off-airport locations, the shift managers may report to a station or branch manager, a unit manager or a district or city manager, but never to an airport manager.  (*See* Lupear Decl. ¶ 6; Tietz Decl. ¶ 4).

---

[7] All of the declarations are attached as Defendants' Exhibit H.  (*See* Section III.G, infra).

All managers, including shift managers, are responsible for a location's profit and loss, performance and customer service levels. (Vitello Dep. at 145). At both airport and off-airport locations, shift managers are responsible for managing the entire operations. Indeed, shift managers at some locations are often times, or all of the time, the only manager on duty. (Lupear Decl. ¶ 10; Tietz Decl. ¶¶ 9, 27). Even for those shift managers generally scheduled to work along with a senior shift manager or airport manager, there are still times when he or she is the only manager on duty. (Deposition of Kenneth Mitchell ("Mitchell Dep."), Pl. Ex. E, at 24-25; Joyner Decl. ¶ 9; Bloomquist Decl. ¶ 8). Additionally, even when some shift managers are scheduled with an airport or district manager, he or she still will "essentially run the facility." (Baroni Decl. ¶¶ 7, 11).

At off-airport locations in particular, shift managers are often the only managers onsite, as there is typically no airport manager, district manger or city manager physically and regularly on site at these locations. (Lupear Decl. ¶ 7). This results in shift managers at off-airport locations being solely responsible for the operations and participating in all management related duties. (Tietz Decl. ¶ 9; Lupear Decl. ¶¶ 7, 13). Shift managers at off-airport locations are also more involved in sales activities than shift managers at airport locations, except for airport shift managers designated as counter sales initiative captains (*see* Section III.G, infra). (Vitello Dep. at 57; Tietz Decl. ¶ 31; G. Bruzzichesi Decl. ¶ 12).

### D.   NAMED PLAINTIFFS[8]

**Matt Ravenell**

Mr. Ravenell was employed by Avis as a Shift Manager at La Guardia from December 2006 through March 2007 – only four months. (Deposition of Matt Ravenell ("Ravenell Dep."), Pl. Ex. O, at 46). Mr. Ravenell was terminated in March 2007 after he failed to report for work. (Ravenell Dep. at 57, 146-47).

**Travis Lubbers**

Mr. Lubbers worked as an Avis and ABCR Shift Manager at Dulles from May 2008 through

---

[8] As of February 2009, all of the Named and Opt-Ins, except for Matt Ravenell, were employed by ABCR; prior to that date they were employed by Avis. (G. Bruzzichesi Decl. ¶ 13).

March 3, 2009.  (Deposition of Travis Lubbers ("Lubbers Dep."), Pl. Ex. Q, at 12).  Mr. Lubbers was laid-off effective March 6, 2009 pursuant to a reduction in force due to a decrease in business. (Declaration of Steve Erb ("Erb Decl."), Def. Ex. C, at ¶¶ 3-4).  Mr. Lubbers asserts an individual retaliation claim against Defendants in this action.  (*See* Amend. Compl.).

**Tyler Talkington**

Mr. Talkington was hired as an Avis shift manager at Dulles in April 2006.  (Deposition of Tyler Talkington ("Talkington Dep."), Pl. Ex. P, at 6-7).   Mr. Talkington was promoted to Senior Shift Manager at Dulles in April 2008 and from approximately March 2009 until the end of his employment he was employed by ABCR.  (Talkington Dep. at 6-7).  Mr. Talkington was terminated effective May 15, 2009 for Code of Conduct violations because he falsified company documents and misused his management car privileges.  (Erb Decl. ¶¶ 8, 16).  Mr. Talkington also asserts an individual retaliation claim against Defendants in this action.  (*See* Amend. Compl.).

**E.      OPT-INS**

Muhammed Bashir has worked as a Shift Manager at Reagan since June 2007.  (Bashir Dep. at 9; Employee Acknowledgment Form, Def. Ex. D).  Kenneth Mitchell has worked as a Shift Manager at Dulles since December 2000.  (Mitchell Dep. at 7, 53).  Torrey Sharrow was hired by Avis as a Shift Manager in September 2005 and was promoted to his current position as an Airport Manager B at Reagan in September 2006.  (Deposition of Torrey Sharrow ("Sharrow Dep."), Pl. Ex. T, at 10).  Adeel Tahir was hired as a Rental Sales Agent at Reagan in August 2003, promoted to Shift Manager at Dulles in October 2005, and promoted to his current position as an Airport Manager B at Dulles in September 2007.[9] (Deposition of Adeel Tahir ("Tahir Dep."), Pl. Ex. S, at 9-10).  Mohammad Zishan began working for Avis as a Rental Sales Agent at Reagan in June 2003 and was promoted to Shift Manager at Dulles in August 2007.  (Deposition of Mohammad Zishan ("Zishan Dep"), Pl. Ex. R, at 6-7).

---

[9] Mr. Tahir also filed a putative collective action lawsuit in the District of New Jersey against these same Defendants alleging that airport managers are also misclassified as exempt in violation of the FLSA.

### F.    JURY TRIAL VERSUS NON-JURY TRIAL

All of the Named Plaintiffs and one of the Opt-Ins (Mr. Bashir) expressly waived their right to a

jury trial.  (M. Ravenell, T. Talkington, M. Bashir, and T. Lubbers Employment Applications, Def. Ex.

E).  The remaining four Opt-Ins, on the other hand, are entitled to a jury trial.  Avis and ABCR rental

locations began using an employment application containing a jury waiver provision around March 2006

and, therefore, any putative class member with a hire date after that date has waived his or her right to a

jury trial.  (G. Bruzzichesi Decl. ¶ 14).  *See Dunn v. Fairfield Resorts, Inc.*, No. 06-cv-3355 (Dec. 12,

2006 Order) (upholding jury waiver contained in employment application and denying plaintiff's motion

for demand of jury trial) (Def. Ex. F).[10]  In short, some putative class members are entitled to a jury trial

and others are not.  For this reason alone, it is not possible for the Court to certify this case as a collective

action.

### G.    SHIFT MANAGERS' JOB DUTIES[11]

Defendants obtained 52 voluntary declarations from current and former shift managers across the

country, including Mr. Talkington and Mr. Tahir.[12]  Unlike the Named Plaintiffs and Opt-Ins (who only

worked at airport locations in New York and Virginia), the declarants that Avis and ABCR present in

support of their opposition to Plaintiffs' Motion worked or work at a variety of Avis locations across the

country ranging from off-airport locations to small, medium and large airport locations.  As detailed

below, the deposition testimony from the Named Plaintiffs and Opt-Ins in this case and the declarations

obtained by Defendants from other shift managers demonstrate that the job duties of a shift manager vary

widely and require individualized inquiry.[13]  Again, despite being provided with contact information for

---

[10] The employment application reviewed in the *Dunn* case is substantially similar to the employment application issued by Avis because both were subsidiaries of Cendant Corporation prior to September 2006. At that time, Cendant Corporation sold or spun off certain subsidiaries, including Fairfield Resorts, and changed its name to Avis Budget Group, Inc.

[11] Plaintiffs claim that they are misclassified as exempt under the FLSA.  Plaintiffs however do not claim that the manner in which they are or were paid violates the FLSA's "salary basis" test.  Accordingly, the issue in this case is whether the job duties performed by the Plaintiffs meet the duties requirements for any one of the enumerated exemptions contained within the FLSA and, in particular, the executive and/or administrative exemptions.

[12] All of the declarations are attached hereto as Defendants' Exhibit H.  Defendants obtained 54 total declarations, but it appears that two of the individuals were not shift managers.

[13] To the extent the Named Plaintiffs and Opt-Ins appear to be similarly-situated, putting aside any self-serving

all of Defendants' declarants, Plaintiffs' Motion contains no evidence that rebuts any of the testimony provided by the declarants.

- **Geographic Location and Seasonality**

How shift managers perform their job duties and the type of duties performed varies by geographic location and the seasonality of the airport's operations.  (Vitello Dep. at 54-55; G. Bruzzichesi Decl. ¶¶ 5, 9).  When a shift manager is hired, he or she receives an orientation handbook, which includes general information given to all shift managers, as well as specific information for that shift manager's location.  (Vitello Dep. at 131-32, 143; Orientation Handbook, Def. Ex. G).  Shift managers at Dulles also attend training at ABCR's Springfield, Virginia office, along with other area shift managers and airport managers.  (Mitchell Dep. at 88-89).  Shift managers at other locations attend training at their respective regional or Area offices, and each Area has its own training team.  (G. Bruzzichesi Decl. ¶ 3).  Additionally, the seasonality of a location results in completely different rental volumes, high and low seasons, hours of operations, weekday versus weekend travel needs, and staffing among other things.  (G. Bruzzichesi Decl. ¶ 6).

- **Physical Size and Lay-out of Location**

The physical size and lay-out of Avis locations also varies widely and these differences influence the actual job duties performed by shift managers.  For example, shift managers at Philadelphia Airport have more responsibilities regarding lot management than shift managers at La Guardia Airport, because of the differences in lay-out, size and rental transaction volume at each location.  (Vitello Dep. at 143-44).  Operations at airport locations also vary significantly depending on the geography of the space leased from the airport authority.  (G. Bruzzichesi Decl. ¶ 10).

- **Volume of Rental Transactions**

The volume of rental transactions varies greatly from location to location.  The broad variation in

---

testimony, that result is not all that surprising given that they all worked primarily at very similar airport locations in Virginia.  Only Matt Ravenell worked in New York and he also worked at a large airport location.  Any similarity among this group, however, cannot be extrapolated across all shift managers employed by Avis and ABCR.  As demonstrated throughout Defendants' Opposition, the vast differences among all of the Avis rental locations impacts the differences in the job duties performed by its shift managers.

rental transaction volume even within the same geographic region has obvious impact on the activity level of the location and, therefore, the role of the assigned shift manager.

- **Groups and Numbers of Employees Supervised**

Shift managers are responsible for managing the hourly employees at their location and making sure they are carrying out their duties. (Mitchell Dep. at 56). The groups of hourly employees supervised by shift managers varies by location and can include: rental sales associates, courtesy bus drivers, roving rapid return agents ("rovers"), service agents, and gate guards. (Vitello Dep. at 65). At many locations there are also preferred customer representatives and preferred shuttle drivers, or "shuttlers," who service preferred customers. (Mitchell Dep. at 53; Ravenell Dep. at 162; Sharrow Dep. at 33). Additionally, some locations contract with outside groups to provide "shuttlers" (also known as "runners") to move vehicles around and between locations, and some shift managers supervise and coordinate the need for these shuttlers. (Reynolds Decl. ¶ 4). Shift managers at some locations supervise dispatchers while at other locations they do not. (Baroni Decl. ¶ 4). La Guardia also has what Mr. Ravenell refers to as "Car Preps" (who are responsible for cleaning the cars), and maintenance employees and mechanics. (Ravenell Dep. at 85, 161-63). Not all locations employ such "Car Preps." (*See, e.g.*, Lazard Decl. ¶ 4; Tietz Decl. ¶ 4; Pichler Decl. ¶ 4).

The number of hourly employees at a location likewise varies greatly. For example, the Cleveland and Detroit airport locations have approximately 175-200 total employees, while an off-airport San Francisco location only has approximately 30 total employees. (Joyner Decl. ¶ 4; Reynolds Decl. ¶ 4; Lupear Decl. ¶ 4). The number of employees scheduled at any particular time also varies significantly by location: during peak shifts at the Seattle Airport location approximately 40 hourly employees are working; at Dulles, approximately 22 hourly employees work each shift; and a Chicago off-airport location has 4-5 hourly employees working during the peak shifts. (Ketcham Decl. ¶ 7; Mitchell Dep. at 84; Tietz Decl. ¶ 7). Of course, seasonality dictates wide swings in staffing at some locations, but not others. Therefore, a shift manager's supervisory role will vary depending upon many location-specific factors.

At many locations, shift managers are assigned to manage specific areas or employee groups, such as the preferred customer area, shuttle bus drivers, the service area, or the rental sales counter. (Creamer Decl. ¶¶ 10-11; Reynolds Decl. ¶ 10; Winkfield-Williams Decl. ¶¶ 11-12; Sharrow Dep. at 53). Mr. Mitchell, for example, is responsible for managing the service agents and rovers. (Mitchell Dep. at 44, 63). Mr. Creamer, on the other hand, is responsible for monitoring only the rental sales counter. (Creamer Decl. ¶10). Yet at other locations, shift managers are not assigned to any particular employee group and instead rotate between groups throughout his or her shift or may rotate on a monthly, quarterly or seasonal basis. (Sharrow Dep. at 69; Talkington Dep. at 36). Other shift managers assist in managing all of the employee groups at their location at all times, even if they are principally responsible for a specific group. (Joyner Decl. ¶10; Reynolds Decl. ¶12).

How shift managers actually manage their assigned hourly employees also varies. At some locations, the shift managers hold daily or weekly employee briefings. (Tietz Decl. ¶ 26; Reynolds Decl. ¶ 21). Other shift managers are responsible for specific meetings, such as safety meetings. (Joyner Decl. ¶ 21). Some shift managers hold daily pre-shift meetings. (Baroni Decl. ¶ 26). Still others meet daily with all of their employees in small groups or individually. (Winkfield-Williams Decl. ¶ 2 ).

- **Whether the Employees at Their Location are Unionized**

Whether all or some of the hourly employees are unionized at a particular location, as well as the particular unions and locals involved, significantly affects how shift managers fulfill their daily duties. For example, at La Guardia, Dulles, Reagan, and Philadelphia Airports most hourly employees are unionized. (Vitello Dep. at 70-71; Ravenell Dep. at 99; Sharrow Dep. at 44). The airport locations in Rochester, New York; Providence, Rhode Island; Huntington, West Virginia; Portland, Maine; and Burlington, Vermont, however, are not unionized. (Vitello Dep. at 71).

There are multiple unions and Collective Bargaining Agreements ("CBAs") within any given unionized location, and the unions and locals representing hourly employees vary both within and between locations. For example, some of the unions at Avis locations include the International Brotherhood of Teamsters; the Teamsters Automotive, Industrial & Allied Workers Union; and the Office

and Professional Employees International Union.  (G. Bruzzichesi Decl. ¶ 8).  The particular provisions of

each CBA affects how shift managers conduct performance appraisals of hourly employees.  (Vitello

Dep. at 113-14).  How shift managers assign overtime is also regulated by the particular CBA in place.

(Vitello Dep. at 129, 147-48; Talkington Dep. at 46-47).  Shift managers have varying levels of

involvement with the union stewards, often times through the grievance or discipline process.  (Tietz

Decl. ¶ 5).  This requires shift managers at unionized locations to be familiar with the relevant CBA

provisions.  (Winkfield-Williams Decl. ¶ 5).  Significantly, shift managers at unionized locations are

prohibited from performing any bargaining unit work.  (*See* Lupear Decl. ¶ 21).[14]

- **Schedules**

Shift managers' responsibilities vary widely depending on work schedules and assignments.

Each location is responsible for its own scheduling.  (Vitello Dep. at 79).  Some locations will schedule

an opening shift manager, a mid-shift manager, and a closing shift manager, but not all locations require a

mid-shift manager.  Rather, the schedule depends upon the particular needs of an operation.  (Vitello Dep.

at 80).  As outlined above, scheduling is driven by multiple factors, including size and geography,

seasonality, volume and the like.

The number and types of employees managed by shift managers also varies depending upon the

day and shift.  For example, a shift manager working on a Sunday at Dulles will manage about 40% less

employees than if he or she were working on Monday at Dulles because the volume of business at Dulles

decreases on the weekends.  (Talkington Dep. at 100).

- **Inventory and Asset Management**

All shift managers are responsible for managing and protecting the Company's assets (i.e.,

predominantly its vehicles and vehicle accessories) – the value of which is indisputably high.  Shift

managers who open the operations at the beginning of the day review and analyze important business data

designed to manage the company's assets and increase revenue from such assets.  Specifically, the

---

[14] Notably, the fact that shift managers working at unionized locations are prohibited from performing bargaining unit work undermines the very merits of Plaintiffs' claims that they perform non-exempt work.

business reports reviewed include: (1) the reservations scheduled for that day or shift; (2) the number of cars scheduled to be returned; (3) what employees are working and whether anyone called out; (4) whether any special equipment is needed, such as luxury cars, and (5) the gas logs. (Mitchell Dep. at 32, 37; Bashir Dep. at 44, 51-53; Sharrow Dep. at 97). The opening shift manager also determines staff coverage, making adjustments depending on the business needs of the location on that particular day and during that particular shift. (Mitchell Dep. at 38, 42). Also, if additional vehicles or equipment are needed to meet the needs of the scheduled reservations, the shift manager arranges for additional vehicles or equipment to be brought to the location. (Bashir Dep. at 97; Talkington Dep. at 82). Closing shift managers are also responsible for asset protection and management functions such as preparing accident reports, managing the GPS unit inventory and reconciling the cash at the rental counter. (Mitchell Dep. at 32, 77; Bashir Dep. at 28; Lucoff Decl. ¶ 28; Lazard Decl. ¶ 36; Sharrow Dep. at 57).

- **Business Management Reports**

Depending upon the particular location and schedule, shift managers complete a wide range of business management reports on a daily or weekly basis, including but not limited to: (1) Idle Car Report (tracks cars that need to be rented) (Lucoff Decl. ¶ 26; Forbes Decl. ¶ 24); (2) 03 Report (tracks overdue rentals); (3) Exception Report (tracks irregularities on contracts) (Lupear Decl. ¶ 22); (4) Projection Reports (provide overview of facility operations to District Manager) (Tietz Decl. ¶ 23); (5) Approve and/or complete the payroll report (Talkington Dep. at 72-73; Joyner Decl. ¶ 18); (6) Cash Audit Report (ensures sales are reported properly) (Pichler Decl. ¶ 25); and (7) Credit Card Report (confirming credit card authorizations are entered accurately into the Wizard system) (Winkfield-Williams Decl. ¶ 2).

- **Special Projects**

Many, but not all, shift managers are responsible for special projects in addition to their daily duties. Some shift managers are assigned responsibility for managing various performance excellence (PEx) projects. PEx is a corporate initiative that involves process improvement and strategic thinking by assessing efficiencies and the quality of the work performed in certain key areas. (G. Bruzzichesi Decl. ¶ 11). At any given location, one or more shift managers could be responsible for any number of PEx

projects that impact that location.  (G. Bruzzichesi Decl. ¶ 11).  For example, some shift managers are involved in a "think-tank" designed to increase employee participation in designing and implementing quality standards.  (Bloomquist Decl. ¶ 19).  Other shift managers are responsible for managing excessive damage to company vehicles (another asset protection responsibility), and ensuring that the customer is appropriately charged for any damage.  (Mitchell Dep. at 79).  Some shift managers visit area insurance companies to increase insurance replacement vehicle business.  (Tietz Decl. ¶ 30).

Another special project is the counter sales initiative ("CSI"), a sales training program intended to improve the skills of Avis rental sales associates.  (G. Bruzzichesi Decl. ¶ 12).  In connection with this training, Avis has designated a shift manager at each location to perform the role of CSI captain.  (*See, e.g.*, Reynolds Decl. ¶ 14; Bloomquist Decl. ¶ 11).  In that role, the designated shift manager is responsible for overseeing the location's participation in the CSI program and reporting on metrics and goal setting for the location to Company leadership.  (G. Bruzzichesi Decl. ¶ 12).

- **Involvement in Hiring, Training, Performance Evaluations and Termination**

The type and level of involvement by shift managers in the hiring, training, evaluation and termination of employees varies by location.  Some shift managers make final decisions with regard to hiring service agents and drivers, and are involved throughout the hiring process.  (Lupear Decl. ¶ 16; Creamer Decl. ¶ 13; Pichler Decl. ¶ 15; Reynolds Decl. ¶ 13; Bloomquist Decl. ¶ 10).  Still others participate in the hiring or termination process and those making the decision rely upon their input, but the shift manager does not make the final decision.  (Tietz Decl. ¶¶ 13, 18).

Some shift managers are responsible for training new employees themselves, while at other locations lead employees in the group where a new employee is assigned, rather than shift managers, do the actual hands-on training.  (Ketcham Decl. ¶ 17).  Other shift managers oversee the training process and make themselves available for questions, but do little hands on training.  (Bashir Dep. at 49).  Some locations have a formal mentoring program that assigns mentees to shift managers.  (Baroni Decl. ¶ 15).  Likewise, many shift managers are responsible for preparing performance observations for newly hired hourly employees after 30, 60, and 90 days of employment.  (Baroni Decl. ¶ 19; Pichler Decl. ¶ 18).

- **Coaching and Disciplining of Hourly Employees**

Shift managers issue verbal and written discipline according to the procedures in place at his or her particular location. Some locations require a second person present during all discipline, while at other locations, the shift manager issues the discipline him or herself. (Lucoff Decl. ¶ 21; Lazard Decl. ¶ 28). Some shift managers choose not to issue any type of corrective actions or just have not had occasion to do so, despite being aware that they are authorized to do so. (Bashir Dep. at 57-58).

- **Scheduling and Assigning of Overtime to Hourly Employees**

Some shift managers are responsible for preparing employee schedules for their location. (Forbes Decl. ¶ 20; Tietz Decl. ¶ 19; Joyner Decl. ¶ 16). Some shift managers are likewise responsible for approving or disproving vacation requests. (Forbes Decl. ¶ 19; Joyner Decl. ¶ 17). Other shift managers are responsible for creating and/or implementing the break schedule for hourly employees. (Foster Decl. ¶ 10; Bashir Dep. at 45). The extent of scheduling duties for shift managers depends upon many factors, including whether their location utilizes the shift bid method for scheduling utilized in unionized locations. (Creamer Decl. ¶ 17).

Shift managers also have discretion to utilize overtime on an as needed basis. For example, at Dulles, shift managers are responsible for finding coverage and assigning overtime, if necessary to staff the overnight shift. (Mitchell Dep. at 20-21). Some shift managers at other locations prefer to get approval from his or her airport or district manager before assigning overtime, while others do not. (Bashir Dep. at 44; Sharrow Dep. at 75; Forbes Decl. ¶ 20).

## IV.    ARGUMENT

### A.    PLAINTIFFS HAVE NOT ESTABLISHED ENTITLEMENT TO NOTICE UNDER SECTION 216(b) OF THE FLSA

Plaintiffs offer only a simple self-serving recitation of the applicable standard in their brief. Plaintiffs' simple recitation is misleading. The Court's analysis of Plaintiffs' entitlement to Notice under Section 216(b) involves a multi-step process. As an initial matter, the Court should assess whether Plaintiffs "proffer some evidence that other similarly situated individuals desire to opt in to the litigation."

*Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164-65 (D. Minn. 2007).  The Court then must analyze whether the Plaintiffs have indeed proven that they are "similarly situated" to the proposed opt-in group.  29 U.S.C. § 216(b).  Lastly, the Court should consider whether it can properly manage this case as a collective action, *i.e.* whether individualized issues will so predominate over common ones that any benefits to be gained from the collective action device are lost (*e.g.,* representative evidence).  Under every step of the Court's analysis, Plaintiffs' Motion fails.

### 1.    Evidence of Interest in this Litigation is Minimal

Although collective actions are not subject to strict numerosity requirements, like Rule 23 class actions, courts often do not certify collective actions where there is little interest among the proposed class.  *See Barten v. KTK & Assoc. Inc.*, C.A. No. 06-1574, 2007 WL 2176203, at *2-*3 (M.D. Fla. July 26, 2007); *West v. Border Foods, Inc.*, C.A. No. 05-2525, 2006 WL 1892527, at * 6 (D. Minn. July 10, 2006); *Dybach v. Florida Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) (remanding to District Court to determine if there were other similarly-situated employees who desired to opt-in).  *But see Amendola v. Bristol-Myers Squibb Co.*, 558 F. Supp. 2d 459, 466 (S.D.N.Y. 2008).

Plaintiffs seek to represent a nationwide collective action, but provide this Court with no reason to certify such a broad geographic class.  During the proposed class period, Avis and ABCR employed more than 1,100 shift managers in its organization spread throughout the country.  (G. Bruzzichesi Decl. ¶ 10).  Considering the age of this case and the large number of potential class members, only 7 additional shift managers, all of whom work or worked in Virginia, have consented to join the lawsuit since it was originally filed by Plaintiff Ravenell in May 2008.  Accordingly, Plaintiffs have presented no interest in this case beyond New York or Virginia – and scant interest even within these states.  Plaintiffs' failure to demonstrate any broad based interest in this litigation undercuts their request for collective treatment.  Indeed, issuing notice in such circumstances runs counter to the Court's "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 266-67 (D. Minn. 1991) (emphasis added).

2.      **Plaintiffs Have Not Established That They Are "Similarly Situated" to a Nationwide Group of Shift Managers**

Even if this Court concludes that Plaintiffs have demonstrated a sufficient level of interest in this case, it should still deny Plaintiffs' request to send notice of this action. Plaintiffs have not offered any evidence sufficient to justify authorizing judicial notice in this case. 29 U.S.C. § 216(b).

i.      **The Lenient Standard Does Not Apply**

Plaintiffs contend that their Motion is subject to the "first step" or "lenient" standard. They are simply wrong. This case has been pending for almost one and one-half years. The parties have engaged in extensive discovery, including multiple depositions. Indeed, Defendants responded to three sets of document requests and three sets of interrogatories, producing over 3,550 pages of documents and other information. The fact that Plaintiffs chose not to use much of the information produced by Defendants does not negate that a significant amount of information was exchanged between the parties – much more than was evidenced in Plaintiffs' Motion. Accordingly, this case is not at the "first step." It is at the "second step" (or at least at a point where a "more searching standard of review is appropriate.").[15]  *See Amendola*, 558 F. Supp. 2d at 466 (denying motion for conditional certification under 216(b) nearly one year after filing of complaint and after class discovery); *Davis v. Charoen Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004) ("This [leniency] rationale disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures."); *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497-98 (D.N.J. 2000) (finding a "stricter standard" applies where extensive discovery has occurred).

Moreover, contrary to the erroneous impression created by Plaintiffs, meeting the similarly situated standard is not easy, much less automatic, *i.e.* a court will not order notice in an FLSA collective

---

[15] Courts increasingly reject the so-called "lenient" standard in favor of a more flexible one. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 894-95 (N.D. Iowa 2008) (rejecting lenient standard where some discovery conducted); *Bunyan v. Spectrum Brands, Inc.*, C.A. No. 07-0089, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008) ("[t]aking the intermediate two-step approach permits the Court to determine whether a sound basis exists for proceeding conditionally as a collective action while also considering all evidence available at this time."); *Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification.").

action simply because a plaintiff asserts that his employer subjects him and his alleged co-workers to a common company-wide policy.  (Pl. Br. at 5-6); *Bosley v. Chubb Corp.*, C.A. No. 04-4598, 2005 WL 1334565, at *3-*4 (E.D. Pa. June 3, 2005) ("automatic preliminary class certification is at odds with the Supreme Court's recommendation to 'ascertain the contours of the action at the outset.'").  In fact, courts are to exercise great caution, particularly where, as here, the parties have already engaged in discovery. *Amendola*, 558 F. Supp. 2d at 467-68 & n. 9.  This is because once discovery has occurred, a court is wise to refrain from conditionally certifying a collective action and issuing notice unless it first assures itself that there is some factual basis for plaintiff's claim that a class of "similarly situated" plaintiffs exist. *Severtson*, 137 F.R.D. at 266-67; *Prizmic v. Armour, Inc.*, C.A. No. 05-2503, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006) ("[a] plaintiff must provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations. . . . Absent such a showing, an employer may be 'unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense.'") (citing *Flores v. Osaka Health Spa, Inc.*, No. 05 Civ. 962, 2006 WL 695675, at *3 (S.D.N.Y. Mar. 16, 2006)).  *See also Amendola*, 558 F. Supp. 2d at 467-68 & n. 9 (noting that court deciding whether to authorize judicial notice must scrutinize merits to determine whether colorable basis for widespread allegations exists) (citing *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

### ii.     Plaintiffs Have Not Shown That Avis Subjected Them or Anyone Else To A Uniform Illegal Policy

Because substantial discovery has occurred, it is incumbent upon Plaintiffs to produce significant competent evidence demonstrating that they are "similarly situated" to the proposed group of exempt shift managers they seek represent.  *Castro v. Spice Plate, Inc.*, C.A. No. 07-4657, 2009 WL 229952, at * 2-3 (S.D.N.Y. Jan. 3, 2009) (denying certification because plaintiff failed to present sufficient evidence of common illegal policy applicable to putative class).  Plaintiffs have failed miserably in this regard.

To support their argument that all shift managers perform the same duties and are similarly-situated, Plaintiffs simply rely on their assertion that Defendants utilize one job description and one

advertisement when seeking to employ a shift manager. Plaintiffs also claim that all shift managers receive the same training and engage in the same primary non-managerial job duties.[16] These boilerplate claims, even if true, fall far short. In fact, they are disingenuous. As detailed in Section III above, shift managers' job duties vary greatly and the rental locations at which they work vary greatly. It is clear that there is no common or representative evidence available that will prove the job duties for each of the Named Plaintiffs and Opt-Ins, much less any others.[17]

In nearly every case, employees can demonstrate that they are alike in some way, whether it be because they share some common job duties or because they are subject to common policies and rules that the employer requires its employees to follow. This does not mean that all employees are similarly situated for purposes of 216(b) certification or that all cases are appropriate for collective action status. Indeed, courts regularly deny certification of proposed classes consisting of, for example, employees with similar or even identical job titles. *See, e.g., Morisky*, 111 F. Supp. 2d at 498 ("Even employees who hold the same job title do not necessarily perform the same work."). The law is clear: even though an employer may assign employees the same job title and exempt classification, an FLSA exemption determination turns on a fact-specific, individualized inquiry into each plaintiff's day-to-day activities. *See Bohn v. Park City Group, Inc.*, 94 F.3d 1457, 1461 (10th Cir. 1996) ("the inquiry into exempt status . . . remains intensely fact bound and case specific") (internal citation omitted); *Ale v. Tennessee Valley Auth.*, 269 F.3d 680, 689 (6th Cir. 2001) (stating exempt status is based on tasks performed and requires

---

[16] Notwithstanding the Named Plaintiffs' and Opt-Ins' self-serving characterization of their job duties, their own testimony reveals that each one of them varied in their job duties depending upon the shift and airport at which they worked. (*See* Bashir Dep. at 8, 26-28; Zishan Dep. at 6-7, 12-18; Sharrow Dep. at 10, 51-59; Talkington Dep. at 5-7, 14-30; Lubbers Dep. at 13, 22-29; Ravenell Dep. at 56-58; Mitchell Dep. at 7, 23-40; Tahir Dep. at 30-58). Indeed, as Opt-In Mitchell testified, shift managers are "responsible for the whole lot, the location" and "anything that comes up in the operation." (Mitchell Dep. at 45). This involves "constantly moving in and out all day," mostly on foot, because "[y]ou put one fire out, and then you go to put another fire out." (Mitchell Dep. at 30, 76). In addition, and significantly, the 52 declarations submitted by Defendants further supports that the job duties performed by the Named Plaintiffs, the Opt-Ins and the putative collective action members vary from shift to shift and location to location.

[17] Indeed, despite their arguments to the contrary, Plaintiffs are not going to rely on their job description as common evidence of their job duties because the job description clearly portrays their job duties as exempt. Rather, at trial, Plaintiffs are going to attempt to rely on their individual testimony to establish that they actually perform non-exempt work. It is this reliance on individual testimony that renders this case unsuitable for collective action status.

court to focus on relevant exemption and each employee's actual job duties); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220-21 (D. Conn. 2003) (denying collective action due to fact-intensive, individualized inquiry associated with exempt status determination); *Scott v. Aetna Servs.*, 210 F.R.D. 261, 264-65 (D. Conn. 2002) ("The determination of whether an employee is properly exempt from the overtime compensation requirements of FLSA is necessarily fact intensive and turn[s] on a careful factual analysis of the full range of the employee's job duties and responsibilities.") (internal citation omitted). Plaintiffs are wrong to suggest otherwise. (Pl. Br. at 12-17).

What this all means is that Plaintiffs cannot just rely on their claim that they (and the putative collective action members) have the same job title, same job description and have gone through the same training. Rather, to establish that they are "similarly situated," they must prove that Avis subjected them all to a uniform, illegal policy or practice. Acknowledging this burden, Plaintiffs assert that the requisite unlawful policy was the alleged misclassification decision itself. (Pl. Br. at 9). Unfortunately for Plaintiffs, however, this assertion is insufficient. That an employer classifies a group of employees as exempt does not establish that such classification was the outcome of a common and uniform illegal policy. *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270-71 (M.D. Ala. 2004) (holding company's decision to classify store managers as exempt not relevant to § 216(b)'s "similarly situated" inquiry). Nor can it be a basis of finding those employees similarly situated for purposes of an FLSA collective action. *See King v. West Corp.*, C.A. No. 04-318, 2006 WL 118577, at *14 (D. Neb. Jan. 13, 2006), *Holt*, 333 F. Supp. 2d at 1271; *Morisky*, 111 F. Supp. 2d at 498-99 (denying FLSA certification because common plan alleged was nothing more than employer's "determination that they are exempt under the [FLSA]").

As the 52 declarations submitted by Defendants along with the Named Plaintiffs' and Opt-Ins' own testimony clearly and overwhelmingly demonstrate, the job duties of shift managers working at Avis branded rental locations vary widely – based on a myriad of factors such as location, management structure and reporting obligations, among others. *See* Section III.G, *supra*. Plaintiffs are, therefore, not "similarly situated" to other shift managers as a matter of law. *See The Hertz Corp.*, 2007 U.S. Dist. LEXIS 53572 (denying Rule 23 certification and quoting from its earlier opinion denying collective

action certification under FLSA Section 216(b): "The Court finds that the Plaintiff's motion suffers from a fatal flaw that further discovery cannot cure: because liability as to each putative plaintiff depends upon whether that plaintiff was correctly classified as exempt [], any collective action would require the Court to make fact-intensive inquiry into each potential plaintiff's employment status"); *The Hertz Corp.*, 2006 U.S. Dist. LEXIS 47999 (denying motion for reconsideration of the court's denial of plaintiff's request for certification of a collective action pursuant to 216(b)).

### 3. Common Proof Cannot Resolve the Alleged Exemption At Issue, Thus Requiring Individualized Hearings

The FLSA regulations expressly provide that in order to determine whether a given shift manager is exempt from the FLSA's overtime provisions, the fact-finder will have to review and analyze each employee's particular responsibilities. 29 C.F.R. § 541.2 ("job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."). This is not a simple or routine task:

> In the end, deciding whether an employee is exempt must be a voyage through fact-bound waters. Although there are a great many stars of law to navigate by, the course turns on the facts of an employee's job duties.

*Harris v. District of Columbia*, 741 F. Supp. 254, 259 (D.D.C. 1990).

Here, again, to determine whether Plaintiffs are similarly situated to other shift managers, the Court will necessarily be required to conduct an individualized factual inquiry of the exempt nature of each shift manager's actual job duties. *See Morisky*, 111 F. Supp. 2d at 498 ("To determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria.").[18] As Defendants have sufficiently demonstrated, the job duties of each shift manager is dependent upon

---

[18] *See also Mike*, 274 F. Supp. 2d at 220 ("Determining whether an employee is exempt is extremely individual and fact-intensive, requiring 'a detailed analysis of the time spent performing . . . duties' and 'a careful factual analysis of the full range of the employee's job duties and responsibilities.'")

multiple, distinct factors – such as location, management structure and reporting obligations, among others.[19]  *See* Section III, supra.

In *Holt v. Rite Aid Corp.*, the court reviewed declarations submitted by the defendant which contradicted the plaintiff's allegation that managers spent the overwhelming majority of their time performing non-exempt tasks and, in denying conditional certification of a collective action, concluded:

> [S]ubstantial evidence has been presented which indicates to this court that, if the case were conditionally certified as a collective action at this stage, the court would have to inquire at a second stage as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation. … The evidence presented to the court, therefore, reveals that all of the Plaintiffs employed as Store Managers or Assistant Managers by Rite Aid, even within the region which includes Alabama, are not similarly situated. The court cannot conclude, therefore, that a nationwide group of Store Managers and Assistant Managers, or even a regional group, is similarly situated for purposes of certifying a collective action.

333 F. Supp. 2d at 1274-75.[20]  Similarly, the record before the Court reveals that individual mini-trials (both jury and non-jury because of the waivers signed by the Plaintiffs and some of the putative class members) will be required to ascertain whether each shift manager performed his or her daily tasks in such a way as to be exempt from the FLSA's provisions.  This alone renders collective treatment of Plaintiffs' putative class claim inappropriate.

### 4.    Plaintiffs' Proposed Collective Action Is Wholly Unmanageable And Inappropriate For Collective Adjudication

The Court must also consider whether it is feasible to ***manage the purported collective*** claims in an efficient and effective manner before authorizing judicial notice.  *Saleen et al. v. Waste Mgmt., Inc.*, C.A. No. 08-4959, 2009 WL 1664451, at * 8 (D. Minn. June 15, 2009); *Myers v. Hertz Corp.*, C.A. No.

---

[19] As Defendants also noted, a large portion of their hourly workforce is unionized and, therefore, with respect to those employees and the locations at which they work, shift managers working at those locations are prohibited from performing bargaining unit work.

[20] *See Clausman v. Nortel Networks, Inc.*, C.A. No. 02-0400, 2003 WL 21314065, at *5 (S.D. Ind. May 1, 2003) (declining to conditionally certify a collective action, following examination of competing witness affidavits, where employer's defense that it properly classified each potential claimant as exempt required an individual assessment of each claimant's factual circumstances, including how much time each claimant spent performing non-exempt work).

02-4325, 2007 WL 2126264, at * 4 (E.D.N.Y. July 24, 2007) (noting necessity for individualized proof barred FLSA collective treatment) (citing *Diaz v. Electronics Boutique of America*, C.A. No. 04-0840E(SR), 2005 WL 2654270, at *6 (W.D.N.Y. Oct. 17, 2005) (denying opt-in notification because proof of exemption required individualized factual inquiries)).[21]  "Those efficiency gains, however, cannot come at the expense of a defendant's ability to prove a statutory defense without raising serious concerns about due process."  *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 579, 588 (E.D. La. 2008) (decertifying collective action after trial: "when there are significant differences in employment experiences, as the evidence presented at trial shows to be the case here, **the procedural advantages of a collective action evaporate**, and the Court's confidence that a just verdict on the merits can be rendered is seriously undermined") (emphasis added).

> ### i. Plaintiffs' Proposed Collective Action Is Rife With Due Process Issues

Here, all of the Named Plaintiffs and one of the Opt-Ins are not entitled to a jury trial by virtue of the jury trial waiver each of them executed.  If notice is sent in this case, it is likely – in fact, probable – that some of the individuals who may opt-in to this action will also have executed a jury trial waiver.  Moreover, to the extent any of them challenges their jury trial waiver, the Court will need to resolve the enforceability of the waiver as to each individual and not on a class wide basis.  Indeed, whether an individual knowingly and voluntarily waived their right to a jury trial is by definition an individual inquiry.  One the other hand, the other four Opt-ins (and likely some putative class members) have not waived their right to a jury trial.  It is inconceivable that individuals who are entitled to try their claims to a jury can be similarly situated to individuals who are not entitled to a jury trial.  In addition, Plaintiffs Lubbers and Talkington assert individual claims of retaliation against Defendants.  The fact that these two

---

[21] *See also Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862, 871 (S.D. Ohio 2005) (noting defendant's "valid concern" that "fact-intensive, individualized inquiry" necessary to resolve matter was "not amenable to a collective action"); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D. Minn. Feb. 15, 1996) ("[T]he court must also look to specific factual similarities or differences and manageability concerns."); *Hinojos v. The Home Depot, Inc.*, C.A. No. 06-00108, 2006 WL 3712944, at * 3 (D. Nev. Dec. 10, 2006) ("[R]esolution of plaintiffs' claims depends on the specific employment conditions in each store and department in which each class member worked and would likely require testimony from individual supervisors and other employees about the circumstances allegedly giving rise to the claimed violations."); *Dudley v. Texas Waste Systems, Inc.*, Civ. Act. No. 05-ca-0078, 2005 WL 1140605, at *2 (W.D. Tex. May 16, 2005).

Plaintiffs are prosecuting additional, individual (not class based) claims that are wholly unrelated to their FLSA wage claim necessarily renders them distinct – not similarly situated – to Plaintiff Ravenell and the Opt-Ins, much less to anyone else who may opt into this action.

In sum, any efficiencies to be gained from pooling the claims at issue in this case are lost because there is inherent variability with respect to the merits of the claims (e.g., no common evidence regarding each individual's job duties and entitlement to overtime under the FLSA) and their due process entitlements (i.e., jury trial versus non-jury trial). Moreover, collective adjudication will require this Court to engage in burdensome individualized inquiries as to each class member's eligibility for overtime under the FLSA.[22] The pooling of claims is not only unnecessary, it is impossible under the circumstances of this case.

### 5.     Plaintiffs' Collective Action Definition is Unascertainable

Plaintiffs' proposed collective action membership definition also effectively "puts the cart before the horse." Plaintiffs define their proposed collective action membership as "all persons who are or were formerly employed by Defendants in the United States at any time since May 22, 2005 to the entry of judgment in this case as shift managers and other comparable positions with different titles, who were **non-exempt employees** within the meaning of the FLSA, who did not receive compensation for all hours worked by them and did not receive any overtime . . ." (Amended Compl. ¶22) (emphasis added). Plaintiffs' proposed definition requires that the Court (and Defendants) make a determination as to which shift managers are non-exempt in order to determine whether they should receive notice about an action challenging their exempt status. This requires that a decision on the merits as to an employee's exempt status be made before notice can be sent out to that employee. Plaintiffs' definition is not ascertainable

---

[22] *See, e.g., Sheffield v. Orius Corp.*, 211 F.R.D. 411, 413 (D. Or. 2002) (denying certification because each claim requires extensive consideration of individualized issues of liability, stating that "action dominated by issues particular to individual plaintiffs can not be administered efficiently because individual issues predominate over collective concerns"); *Mike*, 274 F. Supp. at 220-21 (denying collective action certification "because the proof in this case is specific to the individual…"); *Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000) (denying motion for collective action when "the court would be required to make a fact-intensive, individual determination as to the nature of each potential claimant's employment relationship with [defendant].").

and should be denied on this basis alone. *See, e.g., Wilson v. Toussie*, No. 01-4568, 2008 WL 905903, at

*5 (E.D.N.Y. March 31, 2008) (holding proposed class was unascertainable where plaintiffs injected

"fact-intensive determination as to class membership whereby determining membership would essentially

require a mini-hearing on the merits of each class member's case"); *Blain v. Smithkline Beecham*

*Corp.*, 240 F.R.D. 179, 182 (E.D. Pa. 2007) (denying motion for certification where plaintiffs failed to

define a class capable of ascertaining membership without individualized fact-finding).[23]

### B.    PLAINTIFFS' PROPOSED NOTICE IS DEFECTIVE AND INADEQUATE

Plaintiffs' proposed form of Notice (See Exhibit A to Plaintiffs' Motion), among other things,

fails to accurately set forth the statute of limitations under the FLSA, fails to clearly articulate the effect

of not opting into this action on the state law claims of those putative collective action members who are

also putative class members of Plaintiffs' proposed New York Rule 23 class action, fails to accurately

define the claims and defenses at issue in this case, requires that opt-in consent forms be sent to Plaintiffs'

counsel rather than to the Court and does not identify Defendants' counsel. *See Bowens v. Atlantic*

*Maintenance Corp.*, 546 F. Supp. 2d 55, 84-85 (E.D.N.Y. 2008) *Guzman v. VLM, Inc.*, C.A. No. 07-1126,

2007 WL 2994278, at * 8 (E.D.N.Y. Oct. 11, 2007).  Plaintiffs' proposed Notice also fails to inform the

individuals receiving the Notice of their right to retain counsel other than counsel for the current

Plaintiffs. *See Walker v. The Mountain States Tel. and Tel. Co.*, 112 F.R.D. 44, 48 (D. Colo. 1986),

*vacated on other grounds*, No. 84-M-790, 1988 WL 1000060 (D. Colo. September 26, 1988) ("The notice

previously sent [by plaintiff] is defective for several reasons, including that the consent forms are

captioned as pleadings.  <u>More troubling is that the notice does not explain the right of each potential class</u>

<u>member to obtain independent legal representation.</u>") (emphasis added).  Moreover, the proposed Notice

fails to inform potential opt-in plaintiffs that they may be required to participate in written discovery, and

---

[23]  Defendants acknowledge that these two cases were class actions brought pursuant to Federal Rule of Civil
Procedure 23 ("Rule 23"). Despite the differing standards for certifying a class action under Rule 23 and a collective
action under Rule 216(b), the ascertainability concept is equally applicable in both contexts because it is critically
important in any action that the potential scope of any class (or collective action membership) be easily identified
prior to the commencement of any discovery or the certification of the proposed collective action or class.

appear for deposition and/or trial in the Eastern District of New York.  *See Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630 (D. Colo. 2002).

Lastly, Plaintiffs' request for discovery of putative class members' "name, address, telephone number, dates of employment, location of employment, and employee number" is overbroad.  In particular, Defendants should not be required to disclose exceptionally private personal information regarding its current and former employees' personal telephone numbers.  *See Chowdhury v. DuaneReade, Inc.*, No. 06-2295, 2007 WL 2873929, at *2 (S.D.N.Y. Oct. 2, 2007).  Notification of this litigation via U.S. mail will serve the same purpose of notifying putative class members of the existence of this action, without unduly intruding upon their personal lives.

Accordingly, if this Court grants Plaintiffs' Motion, Avis respectfully requests that the Court instruct the parties to meet and confer to develop an agreed upon Notice to submit to the Court for approval.

## V.       CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion and compel the Plaintiffs (and, in the Court's discretion, the Opt-Ins) to proceed with their FLSA claims on an individual basis.

Kimberly J. Gost (KG0881)
James N. Boudreau (*admitted pro hac vice*)
Nina K. Markey (*admitted pro hac vice*)
LITTLER MENDELSON
A Professional Corporation
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000

Attorneys for Defendants Avis Budget Car Rental, LLC and Avis Rent A Car System, LLC

Date: October 16, 2009