```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    -----------------------------------X
                                         :
 4    MATT RAVENELL, Individually        :
      and on behalf of all other         :   08-CV-2113 (SLT)
 5    persons similarly situated,        :
                                         :
 6                       Plaintiffs,     :   225 Cadman Plaza East
                                         :   Brooklyn, New York
 7              v.                       :
                                         :   July 30, 2012
 8    AVIS BUDGET GROUP, INC., et al     :
                                         :
 9                       Defendants.     :
      -----------------------------------X
10
              TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
11               BEFORE THE HONORABLE STEVEN M. GOLD
                    UNITED STATES MAGISTRATE JUDGE
12

13
      APPEARANCES:
14

15    For the Plaintiff:       SETH R. LESSER, ESQ.
                               KYRA HILD, ESQ.
16                             Klafter Olsen & Lesser LLP
                               Two International Place, Suite 350
17                             Rye Brook, New York  10573

18
      For the Defendant:       KIMBERLY J. GOST, ESQ.
19                             MATTHEW HANK, ESQ.
                               NINA MARKEY, ESQ.
20                             Littler Mendelson
                               1601 Cherry Street
21                             Philadelphia, Pennsylvania 19102

22

23    Court Transcriber:       SHARI RIEMER
                               TypeWrite Word Processing Service
24                             211 N Milton Road
                               Saratoga Springs, New York  12866
25


      Proceedings recorded by electronic sound recording, transcript
      produced by transcription service
```

2

1   (Proceedings began at 4:54 p.m.)

2          THE COURT: Civil Cause for I guess we'll call it a

3   discovery conference.  Ravenell v. Avis, 08-CV-2113.

4          For the plaintiffs.

5          MR. LESSER: On behalf of plaintiffs, Seth Lesser,

6   Klafter & Lesser.

7          MS. HILD: Kyra Hild from Klafter & Lesser.

8          THE COURT: Can you just say your name again a little

9   more slowly?

10          MS. HILD: Kyra Hild.

11          THE COURT: Hild.  Hild, right, I'm sorry.  Thank

12   you.

13          And for Avis?

14          MS. GOST: Kimberly Gost from Littler Mendelson.

15          MR. HANK:  Your Honor, Matthew Hank for defendants.

16          THE COURT: How are you?

17          MS. MARKEY:  Good afternoon.  Nina Markey from

18   Littler Mendelson.

19          THE COURT: So I've read what's been submitted which

20   are letters docketed as 382 and 383 and 384.  I'm trying to

21   figure out what the disagreement is.

22          MS. GOST: Your Honor, if I may.  I'm not sure that

23   we actually do disagree.  I'm also wondering if we could -- I

24   think the issue is is that plaintiffs [inaudible] maybe we

25   disagree with them.  So I'm wondering if it might make sense

3

1   to state what our position is and then see if we have a

2   disagreement.

3            THE COURT: Okay.  I mean obviously the idea of a

4   meet and confer is to have that happen before we all have to

5   come to court but since we're here I can't turn the clock

6   back.  So I'll take you up on your invitation, Ms. Gost.

7            MS. GOST: If you were called -- I think we all

8   recall it at the last conference Your Honor had given us some

9   directives.  During that concert -- not so much a concert.

10  Conference --

11           THE COURT: Wishful thinking.  Freudian slip.

12           MS. GOST: Wishful thinking exactly.  Conference we

13  had talked about the 2006 sort of decision as being really the

14  operative one in the case.  I think Your Honor had even

15  expressed that he thought was 2002 was kind of the earlier

16  one.  There are no claims in this case that go back as far as

17  2002.  So we have the 2006.  We, through our letter, I believe

18  have waived the privilege around that decision that occurred

19  in 2006.  We certainly understand that if the facts were to

20  unfold that there was a subsequent decision that was not

21  involved in litigation and wasn't strategy around litigation

22  that that would also be ripe for exploration.  We don't

23  believe that the facts are going to unfold that way.  If they

24  did I don't think we disagree with Mr. Lesser that he could

25  explore that.

4

1          Mr. Lesser agrees that litigation strategy -- I mean
2     that was really I think the point of our trying to articulate
3     some parameters around discovery related to that decision
4     making because there have been cases -- there are a lot of
5     cases and they're ongoing and they were filed around that time
6     and they continue to be ongoing.  So we want to protect
7     obviously litigation strategy as distinct from the discussions
8     that were previously -- we previously withheld as privilege
9     around the decision making.
10          THE COURT: I'd like to ask an empirical question
11     about that before we get into the decision making that you're
12     asking me to partake in and I wouldn't venture in that realm
13     until I've heard from the plaintiffs obviously but I do have
14     an empirical question.
15          The most frequent example that I've had and that I
16     think the case law reflects of an advice of counsel defense
17     resulting in a privilege waiver is in the intellectual
18     property area.  These issues often don't arise, these issues
19     meaning the ones that we're discussing this evening, because
20     counsel that advises on the patentability or protectability of
21     a mark, patentability of an idea, protectability of a mark is
22     typically not the same counsel that's involved in the
23     subsequent litigation.  Should I infer that the Littler firm
24     was the firm that was involved in advising Avis about the
25     exempt status of the positions in issue here?

5

1          MS. GOST: In 2006, no.  No, it was in-house counsel

2     for Avis who was the counsel that advised the company is also

3     the counsel that that's directing litigation.

4          THE COURT: I see.  So the overlap is not with

5     outside counsel.  Your concern is that in-house counsel not be

6     interrogated about or expected to answer questions about

7     consultations probably mainly with your firm about litigation

8     as opposed to the pre-litigation decision about

9     classification.

10          MS. GOST: Correct.  And conversations that she may

11     have with her client about strategy, relaying strategy she

12     spoke to Littler Mendelson about with say the general counsel

13     or the executives at her company.  So the -- right.  The

14     question that relates to the strategy round or defense of the

15     cases be excluded from any waiver.  The decision making that

16     occurred in 2005 leading up to 2006 that she led that's --

17          THE COURT: Now going to be discovered, yes.  Now, I

18     think we would probably agree as well then that when we say

19     the advice of counsel defense waives the privilege we

20     understand that that does not limit what's waived to the

21     explicit term the advice that counsel gave but to the factual

22     predicate for that advice.  So that we not only have in-house

23     counsel's statement to management or human resources -- we're

24     going to classify these people as exempt and here's why.  We

25     also have to disclose all of the discussion that led up to

6

1  that decision and that counsel relied upon in reaching it, and

2  if that included -- well, let's borrow from the analysis we

3  made in 2002 or if that included here's the empirical data we

4  learned from the 2002 episode and counsel says do we have the

5  same set of facts now, the law hasn't changed, we should come

6  to the same result, that would all be discoverable even though

7  it was related to the 2006 decision -- excuse me.  Even though

8  it emanates from the 2002 decision because it's so related to

9  counsel's basis for the advice in 2006.  We're agreed on that

10  I think.

11          MS. GOST: Those are the facts.  We're agreed on

12  that, yes.

13          THE COURT: I don't mean to steal your thunder or to

14  leave you with nothing to fight about but I am looking for the

15  tempest in this teapot.

16          MR. LESSER: You're heading into the tempest

17  correctly, Your Honor.

18          THE COURT: Okay.  Good.

19          MR. LESSER: It was in fact when we brought this to

20  Your Honor's attention and [inaudible] specifically raised the

21  2002 decisions.  We have testimony on that in the case

22  already.  That was in our [inaudible] met with you.  We said

23  here are the decisions.  We get concerned, plaintiffs get

24  concerned when we get a letter that says the 2000 -- the why

25  of the 2006 decision which the privilege waiver has been

7

1  indeed broader.  That's what Your Honor's order gave three

2  choices on.  That 2002 would suddenly disappear.  We know

3  there's documents about the 2002 audit.  It should be

4  produced.

5        THE COURT: Well, why if they're not relevant to the

6  2006 and -- let me start with an understanding.  Is the

7  premise that Ms. Gost starts with that the 2002 decision is

8  not what's at issue in this lawsuit; it's the 2006

9  classifications that are?

10        MR. LESSER: The -- well, it was not a de novo in

11  essence.  Not a de novo 2005 review.  We have the testimony,

12  already recited it to Your Honor on that.  So it was 2002

13  review was done.  It was decided classification [inaudible].

14  2005 gets looked at again but you can't have one without the

15  other.  It was all of a piece and a continuation of the prior

16  decision.

17        THE COURT: Well, that's an empirical assertion.

18  Let's see if we can agree on concept.  Let's assume that in-

19  house counsel was hired in 2005 and let's assume that this

20  exemption decision was made in 2005/2006 and let's assume that

21  at a deposition you asked counsel did you discuss the 2002

22  audit and in-house counsel said what 2002 audit, I never heard

23  of that.  I had no awareness of it until you raised it in your

24  questioning today and it played no role in the advice I gave

25  or the calculation I made.  We would agree I think that

8

1   further questioning on that topic would be privileged.

2          MR. LESSER: That's correct.

3          THE COURT: You are really raising a different issue

4   if I hear you correctly.  You're saying that the discovery to

5   date indicates to us that facts about the 2002 classification

6   decisions and knowledge of how that process was undertaken

7   informed the 2005/2006 analysis.  There are references back to

8   it in what's already been disclosed.  So we fully expect that

9   when in-house counsel is questioned that to the extent facts

10  or procedures from 2002 inform the analysis and decision

11  making in 2005 and 2006 -- and we already know to some extent

12  they did, that the answers will be responsive and include that

13  information even if it is not explicitly within the fine --

14  narrow contours of the advice of counsel waiver for 2006.

15  Right?

16         MR. LESSER: Correct.

17         MS. GOST: I think we agree but we disagree that the

18  facts are what they are but I think we agree that if as he --

19  I disagree with that.  That has not been the testimony so far.

20  It's different lawyers that were involved for the company in-

21  house.  Ms. Juman [Ph.] wasn't there in '02.  There isn't much

22  overlap but --

23         THE COURT: I actually didn't know that when I posed

24  my hypothetical question.

25         MS. GOST: Right.  You were correct, she was not the

9

1  in-house counsel that was there and gave the advice in 2002.

2  It was a different in-house lawyer for Avis in '05 and '06.

3          THE COURT: I don't want to risk irritating what

4  appears to be a cordial relationship among counsel and between

5  counsel and the court despite these repeated disagreements but

6  I will say that it must be somewhat frustrating to plaintiffs

7  to be pressing these issues and finding the defendant's

8  positions either not holding up or shifting as we go forward

9  and it's somewhat frustrating to me too, not in the sense that

10  I'm annoyed with anybody but in the sense that we're not as

11  efficiently moving forward as possible.

12          I don't want to see the deposition go forward and

13  then have the argument about the instruction not to answer

14  after it and then have to reconvene it.  If the plaintiffs

15  have, and I infer from Mr. Lesser's remarks thus far that the

16  plaintiffs are not going to try to play hard the ball here,

17  that if they have documents or testimony that show an

18  interconnection between the two audits that they will reveal

19  them and that defense counsel will take them very much to

20  heart before considering calling the 2002 work out of bounds.

21          Have you shared the basis for your contention that

22  the 2002 audit informed the 2005, 2006 analysis with defense

23  counsel?

24          MR. LESSER: Yes.  Mr. Pollak was deposed and Mr.

25  Pollak referenced the '02 audit when communications were

10

1  undertaken -- this may ring a bell -- with OCI.  OCI was the

2  third party.  OCI was involved in the 2002 audit.

3          THE COURT: Right.

4          MR. LESSER: So we have a connection in '05 and '02.

5  [Inaudible] the vendor was involved and moreover we have

6  testimony referencing it back.

7          THE COURT: Well, in a way this is kind of an easier

8  problem given what I've just learned.  You say Ms. Schuman was

9  not around in 2002; right?

10          MS. GOST: That's correct.

11          THE COURT: Ms. Schuman is the witness we're talking

12  about; right?  She's the lawyer whose advice is being invoked

13  as the predicate for the good faith defense; correct?

14          MS. GOST: That's correct.

15          THE COURT: So if that's the case then isn't it fair

16  game to ask Ms. Schuman without limitation what were you told

17  that you based your decision on, what information did you

18  retrieve for yourself and rely upon, and what did you

19  communicate.  All of those questions should be fair game and

20  if the answer is I talked to people at OCI about what they did

21  in 2002, I looked at the files from 2002, I spoke to

22  management about what happened in 2002.  Then there can't be

23  an objection about privilege because the question is about how

24  did you make your decision in 2006.  Right?

25          MS. GOST: That's correct.

11

1          MR. LESSER: What's frustrating, Your Honor, is Mr.

2     Pollak was a 30(b)(6) witness on this and obviously what he

3     said made -- we can't rely upon?  Obviously there's a

4     different story now.  That's a little upsetting but he

5     references the 2002 audit as the 30(b)(6) witness for the

6     company and we now learn that apparently his reference was

7     somehow irrelevant.

8          MS. GOST: He was asked about both audits at the

9     30(b)(6).

10          MR. LESSER: Correct.  I agree.

11          MS. GOST: I think we're here talking about something

12     different in a completely different context for a deposition.

13     That was pre any kind of waiver.  Meaning he was asked about

14     the other two.  We've never hidden the fact that there were

15     two and at one point in time in this lawsuit '02 may have been

16     relevant.  If you recall, Your Honor, there were New York

17     claims that may have gone back to '02 --

18          THE COURT: Yes, but --

19          MS. GOST: -- that don't any more.

20          THE COURT: But I'm still really not understanding

21     our dispute because look, if Schuman and Pollak testify in a

22     manner that's inconsistent that's not really a matter for the

23     court to rule on as a discovery matter.  That's a matter for

24     cross-examination at trial.  But everything that Schuman did

25     is discoverable because she wasn't involved in the 2002 audit.

12

1          MS. GOST: Leading up to that decision.

2          THE COURT: It would seem to me that if Schuman says

3   I spoke to counsel from 2002 and this is what he told me about

4   that time period that's discoverable but it probably doesn't

5   open up the 2002 lawyer to deposition about what they thought

6   about it in reaching their decision.  If I had to draw a line

7   off the top of my head, that's probably about where I would

8   draw it.  But if Schuman --

9          MS. GOST: Then --

10         MR. LESSER: Your Honor, I understand.

11         MS. GOST: We are comfortable with that line.

12         MR. LESSER:  I hope you understand or at least you

13  recognize -- I think you understand -- I understand.  I will

14  say it plainly.  [Inaudible] if it turns out that that 2002

15  document or audits are referenced by others in 2005 that

16  played a role, it was reviewed back, considered, referenced, I

17  would be in here and I will be furious and Your Honor

18  respectfully we'll be asking for sanctions and costs

19  [inaudible].

20         THE COURT: I understand.

21         MS. GOST: Understood.

22         THE COURT: So what's important is that Ms. Schuman

23  be instructed -- I assume that there will be a deposition

24  notice.  I assume that the notice will have a duces tecum

25  component.  I've never been a hundred percent sure how to

13

1  pronounce that but I think that's close enough.  Do you know

2  what I mean?

3          MR. LESSER: If you don't --

4          MS. GOST: I think that is correct.

5          THE COURT: That's what happened when they appoint

6  prosecutors to the bench.  They never went through basic

7  training on how to pronounce the Latin terms in civil

8  litigation.  Tecum, tecam, I don't know.  You have to take the

9  documents to the deposition.  So I would say tecum.

10          She's got to look through her reliance materials and

11  whether they're specific to 2006 or whether she looked at the

12  2002 materials or talked to people about them and saw memos

13  about them.  They're going to have to be produced.  As I say,

14  the line is easier because she doesn't have to block anything

15  out of her recollection and keep it privileged because the

16  only thing she participated in is what's been waived.

17          MS. GOST: That's correct.  And, Your Honor, we're

18  comfortable with the line that you said you would draw if you

19  had to.  I mean I think our issue is opening up 2002 more

20  fully.  There's been never any attempt to say we're not going

21  to mention 2002.  To the extent that it informed or there were

22  documents shown to her from 2002 to Ms. Schuman, those things

23  -- that is open for testimony and that was never a position

24  that we were taking.

25          THE COURT: So just to be clear, we're going to have

14

1    full and open discussion of everything Ms. Schuman relied upon

2    in making her decision whether it's information she gathered

3    herself, documents that were given to her, words that were

4    said to her, and you understand that I mean and include

5    electronic signals that were transmitted to her, thought,

6    impressions that she intercepted, everything, and everything

7    she informed or advised Avis in response.  And that would

8    include communications with OCI, it will include

9    communications with Avis personnel.  It will include any other

10   people she consulted with even if they were Littler Mendelson

11   people.  If she said you know what, I get legal issue, we have

12   you guys on retainer or whatever it is and I need some -- a

13   memo on the FLSA --

14            MS. GOST: Or any other law firm.

15            THE COURT: Right.

16            MS. GOST: Or any other law firm.

17            THE COURT: All of that is open.

18            MS. GOST: Up until the decision.  What's not open is

19   what happened after that in terms of litigation strategy,

20   any --

21            THE COURT: Right.  But if she was involved in

22   addressing and giving any further advice about either

23   maintaining the exempt status or discontinuing it, that will

24   be fair game.  Right?

25            MS. GOST: Yes.  Correct.  To the extent that if

15

1  there was -- if the facts uncover that there was some

2  subsequent decision process post 2006, yes.  I don't believe

3  that's what the facts will present --

4        THE COURT: So if the question is did you ever

5  consult with anyone in HR or management about the exempt

6  status of these employees apart from litigation strategy after

7  2006 she'll answer that question without invoking privilege

8  and if she answers it yes and she's asked what were those

9  conversations, who did you have them with and what did you

10  base your advice on, she'll answer those questions with

11  substantive responses as well.

12        So they'll be entitled to know either that in-house

13  counsel had no input in maintaining the exempt classification

14  status after 2006, just gave the advice and the company

15  continued to follow it without further consultation with

16  counsel and therefore if they can make an argument that facts

17  changed or there was something publicized or something like

18  that they'll be able to ask for example are you aware, Ms.

19  Schuman, of the case that came down by the Supreme Court and

20  such and such, did you learn of that case.  Yes, I did.  Did

21  you advise anybody at Avis to reconsider the classification

22  status of the plaintiff group in light of that decision.

23  She'll answer that question.  Did you -- were you ever asked

24  about whether or not there were any legal changes that --

25  changes in the law or new thoughts that occurred to you that

16

1   called into question the advice you gave in 2006.  She'll

2   answer that question and she'll answer it substantively

3   without objection.

4            MS. GOST: As long as those questions -- just so

5   we're clear -- litigation strategy, not like you know your

6   company has been sued five times, did you think about the

7   classification, the context in defending those cases.  That's

8   litigation strategy.  Are we in agreement on that?

9            THE COURT: Litigation strategy would be did you help

10  the company -- did you gather information to provide to

11  counsel for the defense of the case, did you advise your

12  client about the risk that they would lose the case, did you

13  advise your clients about how best to defend the allegations.

14  Those kinds of questions I think would be off limits as

15  litigation strategy.  Did you give your client advice about

16  changing its classifications once you thought about the

17  lawsuit is not litigation strategy.

18            In other words, I think they're probably entitled to

19  make the argument that if you classify in '06 and you're sued

20  in '07, did you consider classifying as non exempt and paying

21  overtime to your employees after you were sued.  I think

22  that's a fair question.  If you're asked did you decline to do

23  that because you were afraid it would undermine your defense

24  in the lawsuit, that's probably not a fair question.  Okay?

25  Does that help everybody?

17

1          MS. GOST: I think we agree.

2          MR. LESSER: It certainly does.

3          THE COURT: Does anybody want to ask me any other

4    hypothetical questions that you could have answered yourselves

5    if you had a more productive interchange?

6          MR. LESSER: Well, the reason we brought it up was in

7    the June 27th letter from Ms. Gost, plaintiff may not ask

8    defendant any questions after the decision.  So there are

9    questions that will certainly arise after the decision that

10   would themselves not constitute litigation strategies. I want

11   to be clear.

12         MS. GOST: We were trying to protect litigation

13   strategy in the waiver.

14         THE COURT: I'm not angry at anybody.  I'm not

15   frustrated to be here.  I was going to be here anyway.  But I

16   do think that if you folks had had a more productive

17   conversation we probably -- I probably wouldn't have to bring

18   you down to court and I won't point fingers in that regard.

19   I'll just you to keep your lines of communication and your

20   civil demeanor in place as long as you can.  But I heard Mr.

21   Lesser and I understand why his patience may be wearing a

22   little thin.

23         Can I help you with anything else while we're all

24   gathered?

25         MR. LESSER: We might as well.

1            MS. GOST: I think we're also going to have a status

2    conference that we had adjourned from July 6th --

3            THE COURT: Thank you.  I had lost track of that.

4            MS. GOST: -- to set -- at that time I think we

5    believed that discovery would have concluded at June 30th.  It

6    has not concluded obviously.  So we'll need some more time on

7    discovery.  Defendants would like to set at the conclusion of

8    discovery a briefing schedule for a decertification motion.

9    We're certainly open to concluding discovery, convening again

10   and setting that schedule or doing it all now, whatever Your

11   Honor would like.

12           THE COURT: We're all here.  I don't see any reason

13   not to schedule everything if we can be pretty confident that

14   the dates we set are going to be met.

15           MR. LESSER: Absolutely although --

16           THE COURT: Decertification is the 216(b), not the

17   23?

18           MS. GOST: It's 216(b), right, to decertify the

19   collective action that's been conditionally certified.

20           THE COURT: Right.  Was there a 23 ever certified?

21           MS. GOST: There was not and --

22           MR. LESSER: Not filed and we're not intending to.

23           MS. GOST: They don't intend to file one.

24           THE COURT: So what's left in discovery and how long

25   do you need to get it done other than Ms. Schuman's deposition

19

1   which I presume is the next big event?

2            MS. GOST: Well, there were some other depositions so

3   I'll let Mr. Lesser kind of speak.  I believe it's what

4   plaintiff's need to finish up.

5            THE COURT: Okay.

6            MS. GOST: The defendants don't need to do any more

7   discovery but plaintiffs do.

8            MR. LESSER: You probably don't recall this but we

9   did appear before you [inaudible] spring.  There were other

10  depositions within the same set of issues as Ms. Schuman

11  [inaudible].  Until we were here today and the parameters are

12  hopefully clearer, we decided not to go forward.  Avis, at

13  least to date, I assume it's changed but I want to make it

14  clear, that if indeed [inaudible] Ms. Schuman we may have to

15  re-notice some of those earlier depositions.  We assume we'll

16  be able to.

17           MS. GOST: Sure.  I was expecting that we would need

18  to produce them regardless but if you're saying that you're

19  not going to necessarily take them all then that's fine too.

20  I assume that we had three scheduled that were canceled and

21  there was another 30(b)(6) --

22           MR. LESSER: Right.

23           MS. GOST: -- that has not been scheduled yet.  I've

24  written for dates but I haven't gotten them from you guys.

25           THE COURT: I think what Mr. Lesser is saying is

20

1  different than what you just said.

2          MS. GOST: Okay.

3          THE COURT: What Mr. Lesser just said is we've

4  already taken a series of depositions on the assumption that

5  there would be no advice of counsel defense invoked to protect

6  the good faith assertion.  Now, some of those people who've

7  already been deposed -- I don't mean to be speaking for you,

8  Mr. Lesser, but I think this was your point -- where we

9  finished our questioning on that assumption we may need to

10 move to reopen those depositions because if Ms. Schuman comes

11 in and says, for example, well, Mr. Pollack told me A, B, C

12 and D and I told him E, F and G and he told me H, Y and K they

13 may want to take Pollack again.

14         MS. GOST: That's fair.

15         THE COURT: And obviously since you've changed your

16 position they're entitled to get a second bite at the apple.

17         MS. GOST: Absolutely.

18         THE COURT: Whoever they need.

19         MS. GOST: I -- right.  So I'm assuming they're --

20 you want to also take the ones that you canceled.

21         MR. LESSER: We may.  We may not need to.

22         MS. GOST: But you may not.  That's what I understood

23 him to say.

24         MR. LESSER: Two legs of that stool are both now

25 covered.

21

1          MS. GOST: Okay.

2          MR. LESSER: There are several specific discovery

3    disputes we have and if we're here today let's at least

4    address them.  Part of our problem simply is preface has been

5    notwithstanding the years we've had discovery requests out

6    there and despite the fact many pages were produced oddly

7    enough things keep popping up that we discover belatedly or

8    produced belatedly and every time we have these disputes we

9    keep getting dribble [inaudible].  Let me give you some

10   examples.  Maybe we'll have agreement now that we're here.

11          There was, for example, a document called an FLSA

12   exemption checklist which was a compensation department

13   document used to determine FLSA status of these positions.

14   The document itself was never produced although it was pretty

15   clearly called for.  We learned of it during a deposition in

16   one of the parallel cases and we requested it specifically.  A

17   blank version was produced by Avis saying that no complete

18   versions existed.  We pressed.  It turned out later there was

19   a partially completed version in 2005 that we now have.  The

20   problem is no other surrounding documents relating to that

21   FLSA exemption checklist have been produced if necessarily

22   some such surrounding documents must exist.  We've asked for

23   it.

24          THE COURT: What is the predicate for the conclusion

25   that some such surrounding documents must exist?

22

1          MR. LESSER: This checklist was given to people.  We

2     know it was partially completed.  There must have been some

3     method of transmittal.  There must have been a cover letter,

4     instructions or the like.

5          THE COURT: Well, not to be -- make too fine a point

6     about it or be argumentative with you but that would indicate

7     that some surrounding documents at least existed and may exist

8     but it doesn't necessarily establish their current existence.

9     I don't have a lot of the transmittals of the key documents

10    that were given to me six, eight years ago.

11         MR. LESSER: I understand.  If we have confirmation

12    they don't exist --

13         MS. GOST: Is that what you want?  You want the --

14         MR. LESSER: Either the documents or confirmation

15    they don't --

16         MS. GOST: What we've already confirmed is that there

17    is no completed one.  There is a draft and we gave that to

18    you.  So you just want something that says there's no email

19    or --

20         MR. LESSER: My concern is -- we asked for documents

21    relating to it, not whether there was, merely a blank one,

22    that we don't get the completed one, not whether there's a --

23         MS. GOST: I don't think that's your request and I

24    don't want to fight with you here.  I think we had a meet and

25    confer.  I know that happened.  That's not your request.  I

23

1  can read your request.  Also the request was dated May 31,

2  2012.  It's not as if we produced documents July 2nd and now

3  you're coming back to us for other ones.

4          But putting that aside, I will go back.  Yes, we

5  will confirm that nothing exists if that helps.

6          MR. LESSER:  There are transcripts of Avis

7  individuals from other cases.  We asked for them.  They

8  weren't produced.  It has turned out through happenstance or

9  otherwise when we learned of the existence of these and we

10  asked for them literally by date then they get produced.  We

11  know there are others in other cases --

12          MS. GOST: We've produced the transcripts for the

13  cases that are like this case.  Am I right about that?  There

14  is nobody who you guys -- that's been deposed that we haven't

15  produced.  So I mean this seems like not very productive.  I

16  don't know that Your Honor wants to hear all this because I

17  don't know what -- I have no letter from you saying we haven't

18  produced --

19          MR. LESSER:  Let me address that.  We have

20  absolutely -- we've gone over these things before.  There is a

21  document relating to system bulletins and general release

22  notifications.  These are in other words that went out from

23  Avis corporate to shift managers across the country.  We have

24  asked for that.  We said give us the complete set.  Indeed in

25  multiple cases when I've had this exact issue [inaudible] yes,

24

1  the complete set will tell you more than some random ones that

2  may have occurred to date.  You have taken the position,

3  somebody will correct me if I'm wrong, that unless there

4  happen to have been one produced previously such as attached

5  to an email relating to one of the opt ins or we specifically

6  identified such a very document we don't get the complete set.

7  We would like the complete set.  I certainly think it's

8  relevant, highly relevant and should be produced and we

9  shouldn't have to search through the entire productions, the

10  date when these should have been frankly produced a long time

11  ago.

12          MS. GOST: You just asked for them also May 31, 2012

13  and, Your Honor, the response was that we've produced them to

14  the extent they came to the shift managers [inaudible] emails.

15  There's tens of thousands.  They come out every day on small

16  things like, you know, remember, check this on the cars.

17  Whatever might come from customer service or safety or the

18  fleet about a particular car.  They're on the intranet is

19  where they can access those.  There are tens of thousands of

20  them from what I understand.  We have asked because there was

21  a meet and confer this morning about that.  We have gone back.

22  It should have been done while I was en route here from

23  somebody to try to assess the actual volume so that we can say

24  this is the data size.

25          THE COURT: I'll tell you what I'm going to do.

25

1  You're right, this sounds like stuff that you folks should be

2  able to work out.  I'm going to give you a half an hour with

3  each other and I'll come back at 6:00 and see how you're

4  doing.

5          MS. GOST: Okay.

6          MR. LESSER: Okay.

7          THE COURT: I'm hoping you can resolve most of this

8  stuff.  On this last one I'll tell you what I would do if it

9  were right for me. I'd say maybe there's a way to get a list

10 of them instead of producing them all and then the plaintiffs

11 can go through the list.  Maybe they have titles or something

12 and they can highlight the ones they want copies of and you

13 can either agree that they're relevant or not.  But I agree

14 with you, car seat installation should probably not be

15 something --

16         MR. LESSER: Your Honor, respectfully, that would be

17 a critical kind of document.

18         THE COURT: Okay.

19         MR. LESSER: Because that would show that a shift

20 manager is being instructed as to the smallest detail --

21         THE COURT: I see.

22         MR. LESSER:  -- and hence is not really managing

23 much of anything.

24         MS. GOST: But they don't --

25         MR. LESSER: That's exactly how these cases get put

1  together.

2          THE COURT: Well, but, Mr. Lesser, if that point were

3  taken to its logical extreme we would have every message, slip

4  every email and every communication between every Avis shift

5  manager and everyone here she reports to over the entire

6  course of limitations period even if there are eight or ten

7  communications per shift.  So maybe we can figure out a time

8  frame or a sampling or something that makes it manageable.

9          MR. LESSER: Right.  Which is why we focused on --

10          MS. GOST: And these don't only go to shift managers.

11 They go to all employees at the location.  So it's actually

12 not as described by Mr. Lesser that it would be a specific

13 communication, these systems bulletins.  You guys have them

14 because you've used them in deposition.  So it's not as if

15 they've been hidden from you.  But I agree perhaps there some

16 kind of dictionary --

17          THE COURT: I'll see you at 6:00.  Thank you.  We've

18 been on -- the reason we're on the record is so that you can

19 have something to refer back to.  I don't -- I guess we'll

20 keep that up.  See you at six.

21 (Off the record at 5:27 p.m.)

22 (Back on the record at 5:53 p.m.)

23          THE COURT: Okay.  What can you report?

24          MR. LESSER: We went through a number of specifics,

25 worked out agreements and shared some informed, got some dates

27

1  set down so we're in very good shape.

2            MS. GOST: I think we're good.

3            THE COURT: I'm glad to hear it.  So tell me a little

4  bit about the dates part so we can figure out when we should

5  reconvene.

6            MR. LESSER: Okay.

7            THE COURT: And when you want to brief your motion

8  under 216(b) for decertification.

9            MR. LESSER: Right.  I think I would recommend that

10 we set a new discovery cutoff date and work from that.

11           THE COURT: Okay.

12           MR. LESSER: I would recommend three months out which

13 puts us at October 30th.

14           MS. GOST: We're in agreement with that date if Your

15 Honor is.

16           MR. LESSER: I would also request, however, even

17 if -- this is up to Your Honor's practices.  It may be

18 valuable to set another court conference date even if we tell

19 you a few days before that we're pulling it down just to

20 address any issues that may have arisen and I would think

21 sometime the second or third week of September might make

22 sense as a holding date if Your Honor wants to do that.

23           MS. GOST: I'm thinking maybe third or fourth week.

24 I think we had discussed perhaps having Rosalie Schuman's

25 deposition at the very beginning of September.  So it seems

1  that any issues if they are going to arise -- maybe we should

2  have that deposition completed before coming back to meet with

3  Your Honor.

4          MR. LESSER: Okay.  As long as we have a date.

5          THE COURT: We're in the middle of the Rosh Hashana,

6  Yom Kippur season there.

7          MR. LESSER: That is true.  I see.

8          THE COURT: Does anybody observe during the interval

9  between those two holidays that's relevant to our group?

10         MR. LESSER: I think that might be me.  However, no.

11 The answer is no.  The 20th, the 21st.

12         THE COURT: So what about -- the 20th is good for me.

13 I could do it at 11:30.

14         MS. GOST: I think, Your Honor, that works for me.

15 I'm going to just check real quick.

16         THE COURT: Take your time.

17                 [Pause in proceedings.]

18         MS. GOST: Yes.

19         THE COURT: Rosh Hashana is the Monday, Tuesday of

20 that week which really means I presume that we're not going to

21 have a lot of activity early in the week.  So I would like to

22 get a letter by the 14th telling me whether you really need the

23 conference if so what you want to fight about when you get

24 here.

25         MS. GOST: Hopefully we will not be fighting about

29

1   anything.

2          THE COURT: Hopefully that will be so.  We now have

3   an October 30th cutoff and you want to make a motion at the

4   close of discovery.  You probably want to get the transcripts

5   first.  So if I gave you --

6          MS. GOST: I think we probably need -- we would want

7   at least 30 days to write the motion.  Yes, at least 30 days

8   if -- 45 if we could have it but --

9          THE COURT: Why don't I give you 30 days to make your

10  premotion conference application to Judge Townes because I'm

11  guessing that's what you need to do.

12         MS. GOST: That's what we need first.  Okay.

13         THE COURT: So that would be by November 30th.  Would

14  you like to go home now?

15         MR. LESSER: We would love to.

16         MS. GOST: Sure.

17         THE COURT: Then you may.

18         MS. GOST: Thank you, Your Honor.

19  (Proceedings concluded at 5:56 p.m.)

20

21

22

23

24

25

30

```
1                         *  *  *  *  *

2        I certify that the foregoing is a court transcript from

3   an electronic sound recording of the proceedings in the above-

4   entitled matter.

5

6                              _____

7                                      Shari Riemer

8   Dated:   August 3, 2012

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```